UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| PAPA JOHN'S INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:25-CV-00270-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| JIANDONG (PETER) XU, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

This matter is before the Court on the Motion to Dismiss for Lack of Personal Jurisdiction, or, in the alternative, Motion to Enforce Arbitration Provision and Dismiss filed by Defendant Jiandong (Peter) Xu. [R. 32]. Plaintiff Papa John's International, Inc. ("Papa John's") filed a response, [R. 37], and Xu replied, [R. 38]. This matter is therefore fully briefed and ripe for review. For the following reasons, the Court will deny the motion to the extent it seeks dismissal for lack of personal jurisdiction but will grant the motion to the extent Xu seeks to stay this matter pending arbitration.

## I. BACKGROUND

Papa John's is an international corporation headquartered in Louisville, Kentucky. *See* [R. 37-2, p. 4]. In June 2020, Papa John's entered into an international agreement with Tinale Good Global Co., Ltd. ("Tinale"), for which Xu is part-owner and guarantor, to develop several Papa John's franchised restaurants in Cambodia. [R. 1, p. 1]. The initial term of the agreement was to continue, subject to the provision for termination, from the execution date until December 31, 2030, with the option to renew the agreement for an additional ten-year term. [R. 37-2, pp. 34–35]. The agreement also provided that, as guarantor, Xu personally guaranteed performance of

Tinale's obligations under the agreement and agreed that he would be personally liable for any failure of Tinale to perform its obligations under the agreement. [R. 1, p. 1].

The negotiation process resulting in this international agreement began in January 2020, when Xu and his business partner submitted an application package to Papa John's office in Louisville, Kentucky. [R. 37, p. 3]; [R. 37-1, p. 2]; [R. 37-4 (application form)]. The application packaged contained a business plan outline and information on Xu's previous domestic franchise relationship with Papa John's, which lasted from approximately 2013 to 2017. [R. 37-4, p. 6]; [R. 37, pp. 3–4]; [R. 32-2, p. 1]. Under this previous agreement, Xu made multiple trips to Kentucky and completed training there, as required by Papa John's. [R. 37, pp. 3–5].

Xu, a resident of New York, never physically traveled to Kentucky in relation to the international agreement. [R. 32-2, pp. 1–2]. Had Xu not previously traveled to and undergone training in Kentucky under the domestic agreement, Papa John's represents that it would have required him to do so under the international agreement. [R. 37-1, p. 3]. During the negotiation process of the international agreement, Xu contacted Papa John's personnel, the majority of whom are based in Kentucky, including through a videoconference guest visit arranged by Papa John's, phone calls, and email exchanges. [R. 37, p. 4]; [R. 37-1, pp. 3–4].

Following the execution of the international agreement, Xu opened seven restaurants in Cambodia between 2020 and 2025. [R. 37, p. 6]. Under the agreement, any notices by Xu to Papa John's were to be sent to Papa John's Kentucky headquarters. [R. 37-2, pp. 39–40]. The agreement also required that Xu comply with Papa John's system standards, including food safety standards. [R. 37-2, pp. 4, 61]. The international agreement also included post-termination requirements, including that Xu would not compete with Papa John's, use, copy, or duplicate Papa John's systems, or infringe on Papa John's marks. [R. 37-2, pp. 85–86].

In February 2025, Papa John's conducted audits of Xu's restaurants, revealing violations of the standards required by the international agreement. [R. 37, p. 8]. Papa John's notified Xu of the audit results and demanded the defaults be cured, or the agreement would be terminated. *Id.* Papa John's terminated the international agreement on March 30, 2025, and demanded strict compliance with the post-termination provisions of the agreement. [R. 29-2, p. 5].

On May 9, 2025, Papa John's filed this lawsuit against Xu, alleging Xu has materially breached his obligations under the agreement by continuing to operate restaurants as if they were authorized by Papa John's following the termination of the franchise agreement between the parties. [R. 1, ¶¶ 15, 19]. Papa John's asserts a claim for specific performance against Xu. *Id.* ¶¶ 18–23 (Count I, Specific Performance). Xu has now filed the pending Motion to Dismiss for Lack of Personal Jurisdiction, or, in the alternative, Motion to Enforce Arbitration Provision and Dismiss. [R. 32]. Papa John's filed a response. [R. 37]. Xu filed a reply. [R. 38]. This matter is therefore fully briefed and ripe for review.

## II. ANALYSIS

### A. Motion to Dismiss Under Rule 12(b)(2)

#### 1. Legal Standard

Federal Rule of Civil Procedure 12(b)(2) allows the Court to dismiss a suit for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). In deciding a motion to dismiss under this rule, the Court has three options: it "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)) (internal quotation marks omitted). The Court retains "considerable discretion" in selecting one of these

three options. *Hardesty v. S.I.T., Inc.*, No. 5:17-cv-00108-TBR, 2017 WL 11483968, at *1 (W.D. Ky. Sept. 14, 2017) (citing *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)). Regardless of which way the Court handles the motion, "the plaintiff always bears the burden of establishing that jurisdiction exists." *Serras*, 875 F.2d at 1214 (citations omitted).

When the Court rules on written submissions alone, "the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth, 'by affidavit or otherwise [,] . . . specific facts showing that the court has jurisdiction.'" *Id.* (quoting *Well v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974)). Once the Court has determined that the personal jurisdiction issue can be resolved on such written submissions, it must consider the pleadings and affidavits in the light most favorable to the plaintiff. *Id.* (citations omitted). Under these circumstances, the plaintiff's burden is "merely that of making a prima facie showing that personal jurisdiction exists." *Id.* (citation omitted). To satisfy this burden, the plaintiff must "establish[] with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)) (internal quotation marks omitted); *see also Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020).

**2. Kentucky's Long Arm Statute**

A federal district court sitting in diversity must conduct a two-step inquiry to determine if it has personal jurisdiction over an out-of-state defendant: "(1) whether the law of the state in which the district court sits authorizes jurisdiction, and (2) whether the exercise of jurisdiction comports with the Due Process Clause." *Brunner v. Hampson*, 441 F.3d 457, 463 (6th Cir. 2006) (citation omitted); *see also Aristech Chemical Intern. Ltd. V. Acrylic Fabricators Ltd.*, 138 F.3d

624, 627 (6th Cir. 1998). When the state's long-arm statue "extends its jurisdiction to due process limits," the two inquiries merge into a single inquiry, and due process is all the Court must address. *Parker v. Winwood*, 938 F.3d 833, 839 (6th Cir. 2019); *see also Clark v. Baker*, No. 3:25-cv-70-RGJ, 2026 WL 125972, at *9 (W.D. Ky. Jan. 16, 2026).

Effective July 15, 2024, the Kentucky General Assembly amended the long-arm statute such that now a Court in Kentucky "may exercise personal jurisdiction over a person who is a party to a civil action on any basis consistent with the Constitution of Kentucky and the Constitution of the United States." Ky. Rev. Stat. § 454.210(2). The amended long-arm statute is applicable in this matter because it was in effect at the time of filing. *See Premier Packaging, LLC. v. Stick Fingers Sweets and Eats, Inc.*, No. 3:24-cv-427-RGJ, 2025 WL 359324, at *3 (W.D. Ky. Jan. 31, 2025). Because Kentucky's long arm statute is coextensive with due process, due process is all that must be addressed. *Id.* Accordingly, the Court will turn its analysis to whether the exercise of personal jurisdiction over Xu comports with the Due Process Clause.

**3. Due Process**

As a preliminary matter, neither party requested an evidentiary hearing on the motion. *See generally* [R. 32-1]; [R. 37]; [R. 38]. When resolving the issue of personal jurisdiction on the written submissions alone, the Court must consider the pleadings and affidavits in the light most favorable to the plaintiff. *Serras*, 875 F.2d at 1214 (citations omitted). Therefore, the Court will construe the facts alleged in the briefing and exhibits in the light most favorable to Papa John's.

The federal Due Process Clause "permits the exercise of both general and specific jurisdiction." *Aristech Chem. Int'l v. Acrylic Fabricators*, 138 F.3d 624, 627 (6th Cir. 1998). General jurisdiction exists if the defendant "has 'continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all

claims.'" *Id.* (quoting *Kerry Steel v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997)). In other words, if the defendant's contacts with the forum state are of a "continuous and systematic nature," then "the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Bird v. Parsons*, 289 F.3d 865, 873 (6th Cir. 2002) (quoting *Third Natl. Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989)) (internal quotation marks omitted).

Xu argues, [R. 32-1, p. 7], and Papa John's does not contest, *see* [R. 37, pp. 10–13], that the Court lacks general personal jurisdiction over Xu. The Court agrees. Xu is an individual and a resident of New York, with no property or other ownership interests in Kentucky. [R. 32-1, p. 11]; [R. 32-2, p. 1]. Under the facts presented, Xu lacks the requisite systemic and continuous contacts with Kentucky to permit the exercise of general personal jurisdiction.

Unlike general jurisdiction, specific jurisdiction allows a defendant to be sued in the forum state only with respect to "claims that 'arise out of or relate to' a defendant's contacts with the forum." *Aristech Chemical*, 138 F.3d at 627–28 (quoting *Kerry Steel*, 106 F.3d at 149) (internal quotation marks omitted). The Sixth Circuit applies a three-part test to determine if a defendant's contacts with the forum satisfy due process. *See, e.g.*, *Aristech Chemical*, 138 F.3d at 628; *Lexmark Int'l Inc. v. Laserland, Inc.*, 304 F. Supp. 2d 913, 915 (E.D. Ky. 2004). Specifically, the Sixth Circuit applies the following test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007) (quoting *Southern Machinery Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

In his motion, and accompanying affidavit, Xu argues that the exercise of specific personal jurisdiction over him in this matter would not comport with notions of fair play and substantial justice. [R. 32-1, p. 12]; *see also* [R. 32-2 (Xu's accompanying affidavit)]. More specifically, he argues that he did not purposefully avail himself of the privilege of acting or causing a consequence in Kentucky because he is a resident of New York and he never physically visited Kentucky in connection to the international agreement. [R. 32-1, pp. 7–9]; [R. 32-2, pp. 1–2]. Xu concedes that he traveled to Kentucky three to four times in connection with the previous domestic agreement between the parties, with his final visit occurring in 2017, three years before he applied for and later entered into the international agreement. [R. 32-1, pp. 7–9]; [R. 32-2, pp. 1–2]; *see also* [R. 37-1, p. 3]; [R. 29-2, p. 3]. Xu argues that the domestic agreement and his visits to Kentucky in relation to it are unrelated to this matter, and therefore, those visits are not a basis to confer specific jurisdiction. *Id.* Further, Xu argues that any connections to the forum state, such as emails exchanged with Papa John's employees, the video conference with Papa John's personnel, and the fact that the contract says it was executed in Kentucky, are entirely related to Papa John's presence there rather than any intentional direction of activity towards Kentucky on his part. [R. 38, p. 3]; *see generally* [R. 32-2]. Xu states that his performance under the contract was to take place entirely in Cambodia and has no relation to Kentucky at all. [R. 32-1, p. 9]; [R. 32-2, p. 2].

In response, Papa John's provides the Supplemental Declaration of Maria Daniel, [R. 37-1], who is the Director of International Business Development and Compliance for Papa John's, and argues that the Court does have specific personal jurisdiction over Xu, [R. 37, pp. 9–13]. Papa John's argues that the requisite minimum contacts with the forum are present whenever a defendant, like Xu, has entered into a long-term contract with a forum-state plaintiff that involves a continuing business relationship in which both parties promised to perform and did perform

obligations in the forum state. [R. 37, p. 11 (citing *Air Prods.*, 503 F.3d at 551)]. Papa John's argues that Xu did purposefully avail himself of the privilege of acting and causing a consequence in Kentucky by applying for, negotiating, and ultimately entering into the long-term international agreement with an entity headquartered in Kentucky. *Id.* at 11–12; [R. 37-1, pp. 1–5]. Papa John's also notes Xu touted and included his prior domestic agreement with Papa John's in his application package and contends that this history induced their assent to the international agreement. [R. 37, pp. 11–12]; [R. 37-1, pp. 2–3]; [R. 37-4, p. 6]. In the management section of Xu's international application, he emphasized that the had been a franchisee "since 2014;" that he "used to own and operate 14 stores in New York area;" and that he "brings with him the training and know how of starting and running high volume Papa John's stores." [R. 37-4, p. 6].

Papa John's attests that had Xu not traveled to and undergone training in Kentucky previously, he would have been required to under the international agreement. [R. 37-1, p. 3]. Also, Papa John's argues that Xu had numerous contacts with Kentucky without physically visiting the state. [R. 37, p. 12]; [R. 37-1, pp. 4–6]. Papa John's states that Xu interacted with Kentucky-based personnel through emails and calls, including instances in which Xu reached out to and worked with various Papa John's teams for support with marketing, designing restaurant buildouts, and customer rewards systems. [R. 37, pp. 7–8, 12]; [R. 37-1, pp. 4–6]. Lastly, Papa John's argues that the cause of action arises out of Xu's contacts with the forum because the breach of contract claim requires the existence of a contract, and the contract at issue would not exist but for Xu reaching out to Papa John's to negotiate and ultimately create the international agreement. [R. 37, p. 12].

**a. "Purposeful Availment"**

First, to exercise specific jurisdiction over an out-of-state defendant, that defendant must

have purposefully availed himself of "the privilege of acting in the forum state or causing a consequence in the forum state." *Southern Machinery*, 401 F.2d at 381. This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or third person." *Burger King Corp. V. Rudzwicz*, 471 U.S. 462, 475 (1985) (internal citations and quotation marks omitted). Specific jurisdiction is proper where the defendant's actions create a "substantial connection" with the forum state. *Id.* Though the existence of a contract with an out-of-state party alone is insufficient to establish such a connection, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequence of their activities." *Id.* at 473. Further, personal jurisdiction may still be exercised over a defendant who never physically entered the forum state when that defendant engaged in an ongoing relationship with a citizen of the forum state. *Id.* at 476.

In *Burger King*, the Supreme Court found that the Michigan-based defendant purposefully directed activities towards the forum state, Florida, by deliberately reaching out to negotiate and enter into a franchise agreement with a corporation with known ties there. *Id.* at 479–80. While entering into a contract with a forum-state resident alone is not sufficient to establish specific personal jurisdiction, the franchise agreement in *Burger King* created a carefully structured, long-term relationship with continuing obligations. *Id.* at 480. Though the defendant had no physical ties to Florida, the Supreme Court concluded that the franchise dispute at issue "grew directly out of a contract which had a *substantial* connection with that State." *Id.* at 479 (emphasis in original) (internal quotation marks omitted) (quoting *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957)). Noting the "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," the Supreme

Court made clear that "[j]urisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State." *Id.* at 476 (emphasis in original). The Supreme Court found that the defendant voluntarily accepted substantial connections to the forum state, including provisions stating that notices by the defendant would be sent to the plaintiff's headquarters in Florida and that all regulation and supervision of the contract were rooted in Florida. *Id.* at 480. Given the defendant's conduct and connections with the forum state, the Supreme Court stated it was foreseeable that the defendant would be haled into court in Florida in order to be held to account for the harm resulting from the breach of the franchise agreement, even though the defendant never previously traveled to Florida. *Id.* at 479, 482.

Similarly, in *Chrysler Corp. v. Uptown Motorcars-Hartford, Inc.*, No. 98-1097, 1999 WL 196558, at *4 (6th Cir. Apr. 1, 1999), the defendant also reached out beyond its state in a series of negotiations to establish and maintain a long-term relationship with a forum-state corporation. The defendant, based in Wisconsin, applied to enter a manufacturer-dealer relationship with the plaintiff, a vehicle manufacturer based in Michigan. *Id.* at *4–*5. Though the defendant's representatives never visited Michigan, *id.* at *2, the court found that the contract contained substantial connections to Michigan and affirmed that "a defendant engaged in a continuing obligation with a citizen of another state need not have physically entered that state to be subject to jurisdiction in it," *id.* at *4 (citing *Burger King*, 471 U.S. at 476). The original agreement was later extended in a subsequent agreement, with both agreements requiring that the defendant send notices to the plaintiff's Michigan headquarters and providing that the terms would be construed in accordance with the law of the state of Michigan. *Id.* at *2. The court concluded that the defendant purposefully availed itself of acting or causing a consequence in the forum state because the defendant initiated a long-term relationship with the forum-based plaintiff, and the agreement

between the parties contained explicit connections to the forum state. *Id.* at *6.

Like in *Burger King* and *Chrysler*, Xu deliberately reached out beyond New York to enter into a long-term relationship, intended to continue for at least an initial term of about ten years, with a Kentucky-based corporation. Specifically, Xu initiated the international agreement at issue by submitting an application to Papa John's forum-state headquarters. [R. 37, p. 3]; [R. 37-1, p. 2] [R. 37-4]. Throughout the negotiation process, Xu communicated with various Kentucky-based Papa John's personnel, including key members of the Papa John's team during a two-day virtual guest visit and members of Papa John's marketing support team in preparation for the guest visit. [R. 37, p. 4]; [R. 37-1, pp. 3–4]. This fact demonstrates even greater connection to the forum state than in *Chrysler*, where the defendant attested that they dealt primarily with the plaintiff's zone office located in the defendant's state. 1999 WL 196558, at *2. Despite these communications occurring in the defendant's own state, the Sixth Circuit found that the defendant purposefully directed its actions towards the forum state, given that the agreements were made in and enforced out of the forum state. In the instant case, Xu submitted his application package to Papa John's headquarters in Kentucky and repeatedly communicated with Kentucky-based personnel throughout the negotiation process, in addition to other connections with the forum state. [R. 37-1, pp. 2–4].

This Kentucky-directed negotiations process resulted in execution of the agreement there by Papa John's. *See* [R. 37-2, p. 46]. The signature block of the development agreement states that it was "[e]xecuted at Louisville, Jefferson County, Kentucky." [R. 37-2, p. 46]. Though this statement only describes Papa John's signature, as Xu notes, [R. 32-1, p. 10], it further demonstrates Xu's knowledge of Papa John's deep connections to Kentucky and that Xu directed his efforts toward Kentucky. The *Chrysler* court considered similar facts in determining the

defendant there directed its actions toward the forum state. 1999 WL 196558, at *5.

Additionally, like the agreements in *Burger King* and *Chrysler*, the agreement established continuing contacts with and management by Papa John's in Kentucky. The international agreement required that notices from Xu be sent to a Kentucky location. [R. 37-2, pp. 39–40]; [R. 37, pp. 2, 6]. Also, given the location of Papa John's headquarters and substantial corporate personnel located in Kentucky, supervision and regulation of various quality and operational standards required by the agreement originated from Kentucky-based personnel of Papa John's. *See* [R. 37-1, p. 5]. Indeed, Xu sought and received support from Papa John's Kentucky-based professionals in areas such as marketing and quality control. *Id.*

The only material difference between this case and the *Chrysler* and *Burger King* cases is the choice of law provision. The agreement in the instant case lacks a choice of law provision similar to the ones in *Chrysler* and *Burger King* that further tied those agreements to the forum states. In *Chrysler* and *Burger King*, the agreement explicitly provided that the forum state law applies. 1999 WL 196558, at *5; 471 U.S. at 481–82. Here, however, the international agreement between Xu and Papa John's provides that "English law" applies. [R. 37-2, p. 41]. The Supreme Court in *Burger King* analyzed this fact in combination with all of the other facts supporting purposeful availment by the defendant, without suggesting that a choice-of-law provision tied to the forum state is necessary in finding purposeful availment in contractual agreements such as here. *See* 471 U.S. at 481–82. This difference alone is insufficient to prevent a finding of purposeful availment based on the record before the Court.

Finally, in his motion and reply, Xu acknowledges traveling to Kentucky three or four times in connection with his previous Papa John's domestic agreement but notes that he never visited Kentucky in connection with the international agreement. [R. 32-1, p. 9]; [R. 32-2, p. 2];

[R. 38, pp. 8–9]. He argues that "[b]ecause this lawsuit does not arise out of Mr. Xu's former New York franchise, Mr. Xu's few, decades-old visits in connection with a separate, unrelated transaction are irrelevant to the question of personal jurisdiction in this case." [R. 38, p. 9]. First, the Court need not and does not rely on Xu's earlier visits to Kentucky in connection with the domestic agreement to find personal jurisdiction in this matter. The Court agrees that for specific jurisdiction, the negotiations and relationships from prior, unrelated contracts are generally not relevant, since specific jurisdiction requires that the suit "arise out of" or "be related to" defendant's minimum contacts with the forum state. *See Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.*, 75 F.3d 147, 153 (3d Cir. 1996); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278–79 (7th Cir. 1997). In *Vetrotex*, cited by Xu, the Third Circuit found that the "prior negotiations," "future consequences," "terms of the contract," and "course of dealing," as contemplated by the *Burger King* Court did not include "dealings *unrelated* to the cause of action." 75 F.3d at 153 (emphasis added). Specifically, the *Vetrotex* court held that, under the facts of that case, the agreement establishing the business relationship between the parties from 1980 to 1989 was not relevant to the determination of personal jurisdiction in the case arising from a later 1992 agreement. *Id.* Addressing a similar set of facts, the Seventh Circuit in *RAR* agreed with *Vetrotex* that in a breach of contract case, the relevant considerations include only the "'dealings *between the parties in regard to the disputed contract*' that are relevant to minimum contacts analysis." *RAR*, 107 F.3d at 1278 (emphasis in original) (quoting *Vetrotex*, 75 F.3d at 153). The *RAR* court, however, noted that "even that line will not always be a bright one," *id.*, and counseled against a bright line test, noting that strong similarities between transactions can suggest the substantive relevance of past transactions and that "not only might a later transaction incorporate understandings formed during prior transactions, but a suit regarding the later

transaction might actually hinge on those prior understandings." *Id.* at 1279.

As mentioned, the Court does not consider Xu's previous travel to Kentucky in connection with the domestic agreement as part of the specific jurisdiction calculus here. However, to the extent Xu attempts to argue that the domestic agreement or the circumstances surrounding it, are wholly irrelevant to the international agreement, *see* [R. 38, p. 9 (describing the domestic agreement as a "separate, unrelated transaction," and "irrelevant")], the Court disagrees, and apparently Xu does as well. Indeed, Xu himself touted specific aspects of his years-long domestic franchise relationship with Papa John's as part of his application for the international agreement. [R. 37-4, p. 6]. Specifically, in the management plan section of his application, he touted, among other things, that he "brings with him the *training and know how* of starting and running high volume Papa John's stores." *Id.* (emphasis added). To be sure, Xu clearly treated certain aspects of his previous Papa John's relationship, including his prior training, as relevant to the international agreement. Accordingly, the Court credits Papa Johns's uncontested arguments that had Xu not undergone training at its Kentucky headquarters previously, he would have been required to travel to Kentucky for such training in connection with the international agreement, and that through the previous franchise relationship, Xu was keenly aware he was directing his efforts toward a Kentucky-based entity. Nowhere does Xu push back on these particular facts, and the Court finds them, on the specific facts of this case, relevant to the minimum contacts analysis.

Taken together, as in *Burger King*, Xu most certainly knew he was "affiliating himself with an enterprise based primarily in [Kentucky]." *Id.* at 480. The application and international agreement made clear that Papa John's operations were conducted from Kentucky, that notices were to be sent to Kentucky, and the agreement was signed by Papa John's from its headquarters in Kentucky. Further, the parties' "actual course of dealing repeatedly confirmed that decision

making authority was vested in the [Kentucky] headquarters." *Id.* at 481. And while Xu did not travel to Kentucky during the tenure of the international agreement, the current dispute "grew directly out of a contract which had a *substantial* connection with [Kentucky]." *Id.* at 479 (emphasis in original) (internal quotation marks omitted) (quoting *McGee*, 355 U.S. at 223). Like the defendant in *Burger King*, Xu reached out beyond New York and negotiated a long-term agreement with a Kentucky corporation with benefits that derived from his affiliation with a Kentucky corporation. *Id.* at 479–80. The quality and nature of Xu's relationship with the Kentucky-based Papa John's "can in no sense be viewed as random, fortuitous, or attenuated." *Id.* at 480 (internal quotation marks omitted). The Court finds that there are sufficient facts demonstrating that Xu purposefully availed himself to suit Kentucky.

**b. "Arising Out Of"**

Second, in order to exercise personal jurisdiction over a defendant, "the cause of action must arise from the defendant's activities" in the forum state. *Chandler v. Barclays Bank PLC*, 898 F.2d 1148, 1151 (6th Cir. 1990). There must be a substantial connection or nexus between the business transacted and the cause of action sued upon. *Chrysler*, 1999 WL 196558, at *6 (quoting *Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996)). The cause of action may also be found to have arisen from the defendant's contacts with the forum state when it was made possible by or lies in the wake of the defendant's contacts. *Air Prods.*, 503 F.3d at 553. The Sixth Circuit has characterized this standard as "lenient," and the cause of action need not "formally" or causally arise from the defendant's contacts. *Bird*, 289 F.3d at 875.

In *Chrysler*, the Sixth Circuit found that there was a substantial connection between the business conducted under the agreement and the cause of action for breach of that agreement to conclude that the cause of action arose from the defendant's activities in the forum state. 1999 WL

196558, at *6–*7. The plaintiff alleged that the defendant breached by failing to create an exclusive dealership facility, as they continued to sell and service Chrysler vehicles at its facilities that also sold and serviced other manufacturers' vehicles. *Id.* The Sixth Circuit stated that because a breach of contract claim has two essential elements—the existence of a contract between the parties and an act allegedly in violation of that agreement—the plaintiff's claim arose out of both the act violating the agreement and the agreement itself. *Id.* The Sixth Circuit further found that "the cause of action for breach of a contract can arise in the forum when the act breaching the contract occurs outside of the forum." *Id.* at *7. By continuing to operate a dealership at a nonexclusive facility, the defendant breached the entire agreement between the parties, and that breach is substantially connected to and therefore arose out of the parties' dealings under the agreement. *Id.*

Similarly, in this case, Papa John's brings a claim for breach of contract, specifically alleging that Xu breached the international agreement by failing to maintain food safety and operational brand standards and by continuing to operate restaurants in violation of the post-termination obligations. *See generally* [R. 1, pp. 1–2]. As in *Chrysler*, this claim arises from both the alleged act in violation of the agreement and the agreement itself. While Xu argues that the cause of action cannot arise from any contacts with the forum state because his performance and the alleged breach took place in Cambodia, *see* [R. 32-1, p. 9], *Chrysler* makes clear that this argument is unavailing, *see* 1999 WL 196558, at *7. The cause of action also arises from the contract itself, and, as Papa John's argues, [R. 37, p. 12], the international agreement at issue in this case would not exist without Xu initiating contact with the forum state by reaching out beyond New York to initiate negotiations for and enter into a long-standing agreement with a Kentucky-based corporation. Accordingly, the Court finds that the claim for breach of contract is substantially related to and therefore arises out of Xu's connections with the forum state.

**c. Reasonableness and Fairness**

Third, in order for the exercise of specific jurisdiction to comport with due process, "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over that defendant reasonable." *S. Mach. Co.*, 401 F.2d at 381. When the first two criterion of the S*outhern Machines* test are met, "an inference of reasonableness arises" and "only the unusual case will not meet this third criteria." *Theunissen*, 935 F.2d at 1461 (citation omitted). In determining whether the exercise of specific jurisdiction is reasonable, the Court considers "the burden on the defendant; the interest of the forum state; the plaintiff's interest in obtaining relief; and other states' interest in securing the most efficient resolution of the policy." *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005).

Neither party cites these factors, nor do they provide the Court with any specific argumentation under the reasonableness prong. *See generally* [R. 32]; [R. 37]; [R. 38]. Nonetheless, based on the facts provided, the Court finds that the exercise of personal jurisdiction over Xu in Kentucky is reasonable and fair. As previously discussed, it was foreseeable and thus reasonable for Xu to expect to be haled into Kentucky court for issues arising under this agreement. Remember, Xu first initiated negotiations with Papa John's by submitting an application package to their Kentucky headquarters. Further, that negotiation process resulted in a contract establishing a long-term relationship with and continuing obligations to a Kentucky-based corporation. Under the contract, Xu was required to send any notices to Papa John's Kentucky headquarters, and many aspects of the contract were supported or managed by Kentucky-based employees. Indeed, while the agreement was in effect, Xu connected with Kentucky-based Papa John's personnel for assistance in establishing a quality control center and marketing programs. Further, Xu knew of

Papa John's significant presence in Kentucky from the agreement itself, further demonstrating that it was reasonable for him to expect to be sued here for issues arising out of the international agreement.

Considering the burden on the defendant, while it is true that Xu will have to travel to Kentucky for this case, such is neither unfair nor surprising given Xu entered into a long-term agreement with a Kentucky-based corporation that involved continuing obligations between the parties partly focused in Kentucky. Although the *Burger King* Court noted that inconvenience may at some point reach constitutional magnitude, as in *Burger King*, "this is not such a case." 471 U.S. at 484. As to the other factors, none weigh strongly in either direction, and certainly do not tip the balance to overcome the inference of reasonableness given the satisfaction of the first two due process criterion. The exercise of specific personal jurisdiction over Xu is reasonable and fair.

With all elements met under the *Southern Machines* test, the Court finds that the exercise of specific personal jurisdiction over Xu is consistent with constitutional due process.

**B. Alternative Request to Stay Pending Arbitration**

Xu alternatively requests that the Court dismiss Papa John's claims pursuant to the parties' agreement to arbitrate. [R. 32-1, pp. 12–17]. Xu later clarifies that he believes the Court should stay the action, rather than dismiss those claims. [R. 39]. Because the Court has determined that it possesses personal jurisdiction over Xu, it will now consider his alternative request to stay this matter pending arbitration.

For support, Xu cites to Section 21.c of the parties' development agreement. *See, e.g.*, [R. 32-1, p. 13]. That provision is titled "Arbitration" and states, in relevant part,

> Subject to Section 21.b, any dispute, controversy or claim arising out of or in relation to this Agreement, or the breach, termination or invalidity thereof, will be settled by arbitration by the International Court of Arbitration of the International

> Chamber of Commerce ("ICC") in accordance with the then current ICC Arbitration rules.

[R. 32-3, p. 41].[1] That provision further provides that "[t]he place of arbitration will be London," and "[t]he substantive law of the arbitration will be the laws of England and Wales." *Id.*

Section 21.b, in turn, is titled "Trade Marks and other Intellectual Property Rights." That provision states,

> Any questions arising out of this Agreement as to the validity or effect of the Trade Marks and any other intellectual property of the Franchisor or the Franchisor's Group will be decided in accordance with the laws of the country in which the Trade Marks or intellectual property rights in question have been registered or applied for or subsist. *The Franchisor reserves the right to submit any claims and seek injunctive or other interlocutory relief related to the infringement of the Trade Marks and other intellectual property rights in the Courts in the Development Area.*

*Id.* (emphasis added). The Development Area is defined as "the entire territory of the Kingdom of Cambodia, as constituted and with the geographical boundaries as they exist on the date of this Agreement." *Id.* at 49.

In addition to this "carveout" provision, the agreement also includes Section 21.e, titled "Injunctive Relief." That provision states, in full,

> Without prejudice to the other provisions of Section 21 above the Franchisor will nevertheless still have the right to apply at any time for injunctive, other interlocutory or emergency relief to any local court having jurisdiction to grant interim relief. In the event of any such application, the court may apply the law of its own jurisdiction.

*Id.* at 42.

Xu argues that Papa John's claims "fall squarely within the scope of matters that must be arbitrated under Section 21.c, as they concern alleged breaches of the Development Agreement and ostensibly seek payment for past due amounts owed under the Development Agreement,

[1] To the extent the page numbers listed on a document differ from the page number assigned by the Court's electronic docketing system, the Court uses the page number assigned by the docketing system.

enforcement of Tianle's post-termination obligation, and an award of attorney's fees." [R. 32-1, p. 13]. Thus, Xu argues, these claims must be submitted to arbitration. And to the extent Papa John's relies on Section 21.e's carveout for injunctive relief, Xu argues, that provision only applies to interim relief, i.e., "relief to preserve the status quo pending a final resolution of the merits," like a temporary restraining order or preliminary injunction. *Id.* Because Papa John's seeks a final resolution on the merits, including a *permanent* injunction, Xu argues that Papa John's claims go beyond the interim relief contemplated by Section 21.e, making it inapplicable. *Id.* at 14. Moreover, Xu argues, the United States District Court for the Western District of Kentucky is not a "local court having jurisdiction to grant interim relief," as required by Section 21.e. *Id.* at 15. Lastly, Xu argues that, to the extent there is a question as to whether Papa John's claims must be brought in arbitration, that question of "arbitrability" is reserved for the arbitrator, not the Court. *Id.* at 15–17.

In response, Papa John's does not rely on, nor even address, Section 21.e. *See* [R. 37, pp. 13–15]. The Court therefore understands that Papa John's does *not* dispute that Section 21.e is inapplicable here, where Papa John's seeks a resolution on the merits and a permanent injunction. Instead, Papa John's argues that Section 21.b applies. *Id.* As noted above, that provision permits Papa John's "to submit any claims and seek injunctive or other interlocutory relief related to the infringement of the Trade Marks and other intellectual property rights in the Courts in the Development Area," that is, Cambodia. [R. 32-3, pp. 41, 49]. Papa John's insists that this provision must be read in conjunction with Section 20.b[2] of the Unit License Agreements entered into by Papa John's and Tianle Food Global Co., Ltd. [R. 37, p. 14]. That provision largely mirrors Section

[2] Papa John's cites to Section 21.b of the license agreement; however, the Court understands that Papa John's refers to Section 20.b. *See* [R. 37, p. 14].

21.b of the development agreement, but it authorizes Papa John's to "submit any claims and seek injunctive or other interlocutory relief" related to trademarks and intellectual property "in the Courts in the Development Area *or in any other court of competent jurisdiction*."[3] [R. 37-3, p. 38 (emphasis added)]. Based on these two provisions (from two different contracts), Papa John's argues that claims related to trademark infringement and intellectual property rights can be brought in "any 'court of competent jurisdiction.'" [R. 37, p. 14]. Papa John's then briefly addresses the "arbitrability" question and, from the best the Court can tell, argues that Section 21.b's carveout demonstrates that the parties did not intend to submit the arbitrability of such claims to an arbitrator. *Id.* at 14–15.

Thus, the parties have identified two primary issues relating to arbitration.[4] First, does Section 21.b permit Papa John's to bring its claims in the Western District of Kentucky, seeking permanent, rather than interim, relief? And second, is this a question of arbitrability that must be submitted to arbitration? The Court considers the latter question first. To do so, the Court turns to basic principles of federal arbitration law.

Under the Federal Arbitration Act,[5] a contract provision "to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2; *see also New Heights Farm I, LLC v. Great American Ins. Co.*, 119 F.4th 455, 461 (6th Cir. 2024). Thus, the Act "supports arbitration as a vehicle for dispute resolution and confirms the 'fundamental principle that arbitration is a matter of contract.'" *New*

[3] Section 20.c of the license agreement appears to mirror the arbitration agreement contained in Section 21.b of the development agreement, likewise incorporating the ICC Rules of Arbitration. *See* [R. 37-3, p. 36].

[4] The parties do not dispute that a valid agreement to arbitrate exists.

[5] The parties do not appear to dispute that the Federal Arbitration Act applies in this case. *See* [R. 37, p. 13 (citing the Federal Arbitration Act)]; 9 U.S.C. 2 (referencing "[a] written provision in . . . a contract evidencing a transaction involving commerce . . .").

*Heights*, 119 F.4th at 461 (quoting *Rent-A-Ctr. W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). This applies to "gateway questions of arbitrability" as well, "such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* at 461 (quoting *Rent-A-Ctr.*, 561 U.S. at 68–69) (citation modified). Typically, "these questions are 'for a court to decide.'" *Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–85 (2002)). However, "parties may agree to arbitrate those questions," although "there must be 'clear and unmistakable' evidence of their agreement to do so." *Id.* (quoting *Rent-A-Ctr.*, 561 U.S. at 69 n.1); *see also Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844 (6th Cir. 2020). "And when parties have agreed to arbitrate 'arbitrability,' a court may not disregard their agreement—even if a particular argument for arbitration seems to be 'wholly groundless.'" *Blanton*, 962 F.3d at 844 (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019))

In the present case, Xu argues that the parties agreed to arbitrate the issue of arbitrability. *See* [R. 32-1, pp. 15–17]. To demonstrate the parties' intent to do so, Xu points to Section 21.c's express incorporation of the ICC's arbitration rules. *Id.*; *see also* [R. 32-3, p. 41]. As noted above, that provision states, in relevant part, "Subject to Section 21.b, any dispute, controversy or claim arising out of or in relation to this Agreement, or the breach, termination or invalidity thereof, will be settled by arbitration by the [ICC] in accordance with the then current ICC Arbitration rules." [R. 32-3, p. 41]. Those ICC rules,[6] in turn, provide that "if any party raises one or more pleas

[6] Xu cites the 2021 ICC Rules of Arbitration, which were the rules in force at that time. However, the 2026 ICC Rules of Arbitration became effective on June 1, 2026. *See* ICC, *2026 Arbitration Rules*, https://iccwbo.org/dispute-resolution/dispute-resolution-services/arbitration/rules-procedure/2026-arbitration-rules/#block-accordion-8 (last visited August 14, 2026). The provisions cited by Xu, Articles 6(3) and 6(4), are now captured in Articles 7(1) and 7(2). *Id.*; *see also* ICC, *ICC Arbitration Rules 2021 and 2026 Compared Version*, https://iccwbo.org/wp-content/uploads/sites/3/2026/06/ICC-Arbitration-Rules-2021-and-2026-compared-version-1.pdf. While minor changes have been made to those provisions, the Court has reviewed those changes, and they do not alter Xu's argument or the Court's analysis. Thus, while the Court refers to the current ICC Rules of Arbitration, its analysis would be the same under the prior version.

concerning the existence, validity or scope of the arbitration agreement," then "the arbitration shall proceed, and the arbitral tribunal shall decide directly any question of jurisdiction."[7] By incorporating these rules, Xu argues, Papa John's "expressly agreed that an arbitrator—not a court—would determine all questions of arbitrability." [R. 32-1].

For support, Xu cites to the Sixth Circuit's decision in *Blanton v. Domino's Pizza Franchising LLC*. In that case, an employee (and others) brought suit against his previous employer, which quickly moved to compel arbitration pursuant to the parties' agreement to arbitrate "a wide array of issues related to [the plaintiff's] employment" in accordance with the American Arbitration Association ("AAA") rules. *Blanton*, 962 F.3d at 844. Those rules provided that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* at 845. The Sixth Circuit ultimately held that, by incorporating the AAA rules, the parties had clearly and unmistakably agreed to arbitrate threshold questions of arbitrability. *Id.* at 845–46. In reaching this conclusion, the Sixth Circuit noted that "every one of our sister circuits to address the question . . . has found that the incorporation of AAA Rules (or similarly worded arbitral rules) provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.'" *Id.* at 846 (collecting cases); *see also Warren Steel Holdings, LLC v. Williams*, No. 4:07-cv-1883, 2007 WL 2688240, at *3 (finding that the parties agreed to arbitrate arbitrability when they incorporated the ICC Rules of Arbitration).

Papa John's does not dispute the general holding of *Blanton*, that is, that the express incorporation of the arbitration rules, which empower the arbitrator to determine questions of

---

[7] *See* ICC, *2026 Arbitration Rules*, https://iccwbo.org/dispute-resolution/dispute-resolution-services/arbitration/rules-procedure/2026-arbitration-rules/#block-accordion-8 (last visited August 14, 2026).

arbitrability, can be clear and unmistakable evidence of the parties' agreement to submit such questions to the arbitrator. However, Papa John's argues that *Blanton* is distinguishable from the current case. [R. 37, pp. 14–15]. The arbitration agreement in *Blanton*, Papa John's argues, did not include the "subject to" language that this arbitration provision includes. Again, Section 21.c states that, "*[s]ubject to Section 21.b*, any dispute, controversy or claim arising out of or in relation to this Agreement, or the breach, termination or invalidity thereof, will be settled by arbitration by the [ICC] in accordance with the then current ICC Arbitration rules." [R. 32-3, p. 41]. Given the "subject to" language, Papa John's argues that the agreement does not incorporate the ICC Rules of Arbitration for disputes that fall within Section 21.b's carveout provision. *See* [R. 37, pp. 14–15].

For support, Papa John's cites to the *Blanton* Court's discussion of that arbitration agreement's carveout provision. The Sixth Circuit acknowledged that "some courts have read similar provisions more narrowly when an arbitration agreement carves out certain claims from the very provision that incorporates the AAA Rules," citing to the Fifth Circuit's decision in *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 280 (5th Cir. 2019). *See Blanton*, 962 F.3d at 847. In that case, the Fifth Circuit concluded that questions of arbitrability were not reserved for the arbitrator because the carveout provision was embedded within the provision that incorporated the AAA rules. *Archer*, 935 F.3d at 281. That agreement read, "Any dispute arising under or related to this Agreement (except for actions seeking injunctive relief and disputes related to trademarks, trade secrets, or other intellectual property . . . ), shall be resolved by binding arbitration in accordance with" AAA rules. *Id.* at 277. The Fifth Circuit read this to mean that the parties agreed to incorporate the AAA rules for all disputes *except* those falling within the carveout. *Id.* at 281.

Having cited to the *Archer* decision, the *Blanton* Court discussed the following hypothetical:

> Imagine that [the employee's] arbitration agreement said that "the arbitration *(except as to antitrust claims against non-signatories)* will be conducted in accordance with then-current [AAA Rules]." In that scenario, one might think that the agreement "incorporates the AAA rules—and therefore delegates arbitrability—for all disputes *except* those under the carve-out." [*Archer*, 935 F.3d at 281]. But to the extent that [the employee's] arbitration agreement carves out certain claims from arbitration, it does so from the agreement in general, not from the provision that incorporates the AAA Rules. So the carveout goes to the *scope of the agreement*—a question that the agreement otherwise delegates to the arbitrator—not the *scope of the arbitrator's authority* to decide questions of "arbitrability."

*Blanton*, 962 F.3d at 848.

Notably, the employee-plaintiff in *Blanton* did not raise any arguments about the carveout provision, and this discussion is therefore dicta. *See id.*; *Pinnacle Design/Build Group, Inc. v. Kelchner, Inc.*, 490 F. Supp. 3d 1257, 1264 (S.D. Ohio 2020) (describing the above-cited discussion as dicta). Nevertheless, Papa John's cites to this discussion and argues that *Blanton* "cited favorably" to *Archer* and, as a result, *Archer* should govern the disposition of this case. [R. 37, p. 15]. As an initial matter, the Court notes that *Blanton*'s citation to *Archer* and brief discussion of a hypothetical carveout in no way suggests that the Sixth Circuit approved of the Fifth Circuit's analysis. *See Pinnacle*, 490 F. Supp. 3d at 1265 (citing the carveout discussion in *Blanton* and concluding that it "suggests that, faced with the issue, the Sixth Circuit would reach a different result than the Fifth Circuit in" *Archer*).

Moreover, a year after *Blanton*, the Sixth Circuit addressed a similar issue in *Ciccio v. SmileDirectClub, LLC* ("*Ciccio II*"), 2 F.4th 577 (6th Cir. 2021). That case involved a contract for the sale of orthodontic instruments. *Id.* at 580. The contract contained an arbitration agreement, through which the parties agreed that "any dispute regarding the products and services offered [b]y

[the defendant], including but not limited to medical malpractice disputes, will be determined by submission to arbitration and not [b]y lawsuit filed in any court, *except claims within the jurisdiction of Small Claims Court*," and that "the arbitration shall be . . . resolved using the rules of the [AAA]." *Id.* (emphasis added). A lawsuit was eventually filed, and the defendant moved the court to compel arbitration. *Id.* One of the plaintiffs, Dena Nigohosian, argued that her claim fell "within the jurisdiction of Small Claims Court," and was therefore not subject to arbitration. *Id.* The district court disagreed, concluding that the issue was "a gateway question of arbitrability and that the partes agreed to arbitrate such gateway questions." *Id.* (citation omitted). In reaching that conclusion, the district court considered and rejected the Fifth Circuit's reasoning in *Archer*. *See Ciccio v. SmileDirectClub, LLC* ("*Ciccio I*"), No. 3:19-cv-00845, 2019 WL 8298262, at *2–3 (M.D. Tenn. Dec. 2, 2019).

The matter ultimately made its way to the Sixth Circuit on a related issue, namely, a motion to compel arbitration of another plaintiff's claims. The Sixth Circuit concluded that the defendant and that plaintiff had raised gateway issues of arbitrability and, by incorporating the AAA rules, they had agreed to arbitrate such issues. *Ciccio II*, 2 F.4th at 583–84. It does not appear that those specific claims fit within the "Small Claims Court" carveout, so the Sixth Circuit's analysis on those claims is not entirely helpful here. However, in its analysis, the Sixth Circuit explained that the agreement's incorporation of the AAA rules "provides clear and unmistakable evidence that the parties agreed to arbitration gateway arbitrability questions," and "[t]hat's why the district court compelled Nigohosian to arbitrate the gateway question of whether the small-claims clause in the Agreement allowed her to litigate." *Id.* at 583. Thus, while the Sixth Circuit was not tasked with reviewing the district court's decision as to Nigohosian, it appears to approve of the district

court's reasoning. And this, in turn, casts serious doubt on the *Archer* analysis.[8]

Indeed, other courts have also called *Archer* into question. For example, in *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 714 (Tex. 2023), the Supreme Court of Texas rejected the Fifth Circuit's reasoning in *Archer*.[9] That court explained that "holding that [the AAA rule empowering the arbitrator to resolve questions of arbitrability] only applies if a court first determines that the claim is subject to the arbitration agreement would render the rule essentially meaningless." *Id.* (citation omitted). The Supreme Court of Texas therefore declined to adopt the Fifth Circuit's reasoning. *Id.* Instead, the state court considered the analyses of various other courts (including the Sixth Circuit in *Blanton*) and concluded that "the fact that the parties' arbitration agreement may cover only some disputes while carving out others does not affect the fact that the delegation agreement clearly and unmistakably requires the arbitrator to decide whether the present disputes must be resolved through arbitration." *Id.* at 719; *see also Ciccio I*, 2019 WL 8298262, at *3 ("If an arbitration provision provides that its scope is itself subject to mandatory arbitration, it must, by definition, be the case that mandatory arbitration extends not only to all actually arbitrable cases, but also, at least, to colorably arbitrable cases *for the limited purpose of determining arbitrability*. Otherwise, the commitment of the gateway issue to the arbitrator would be meaningless." (emphasis in original)).

---

[8] The Court is aware of at least one district court in the Sixth Circuit that relied on *Archer* in noting that the parties had not clearly and unmistakably agreed to delegate questions of arbitrability when the arbitration agreement contained a carveout provision. *See United States v. Miraca Life Sciences, Inc.*, No. 3:13-CV-01025, 2021 WL 679275 (M.D. Tenn. Feb. 22, 2021). However, that decision was issued prior to the Sixth Circuit's decision in *Ciccio II* and appears to disregard that same district court's earlier decision in *Ciccio I*. Moreover, the Court has reviewed that non-binding decision and finds it to be unpersuasive. For instance, that court first concluded that the party had waived the issue, and it is on this basis, waiver, that the Sixth Circuit affirmed. *See United States ex rel Dorsa v. Miraca Life Sciences, Inc.*, 33 F.4th 352, 356–58 (6th Cir. 2022), abrogated on other grounds in *Kloosterman v. Metropolitan Hospital*, 153 F.4th 501 (6th Cir. 2025).

[9] The Supreme Court of Texas also rejected the Second Circuit's similar holding in *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308 (2d. Cir. 2021).

Among the cases discussed by the Supreme Court of Texas was *WasteCare Corporation v. Harmony Enterprises*, 822 F. App'x 892 (11th Cir. 2020), decided by the Eleventh Circuit roughly one month after *Blanton*. The arbitration agreement in that case included language very similar to the agreement in *Archer* and the hypothetical language crafted in *Blanton*. It provided that "any controversy or claim (excepting claims as to which party may be entitled to equitable relief) . . . shall be settled by arbitration in accordance with the then current commercial rules of arbitration of the [AAA]." *Id.* at 894. When the plaintiff filed a lawsuit seeking equitable relief, the defendant moved to compel arbitration, arguing that the claims were "mischaracterized" as equitable claims. *Id.* The district court denied the motion, but the Eleventh Circuit reversed. It held that the parties, by agreeing to arbitrate under the AAA rules, had "clearly and unmistakably delegated questions of arbitrability to an arbitrator." *Id.* at 895–96. And the carveout for equitable relief "[did] not affect this analysis" because "[a]lthough [the plaintiff's] claims may indeed be equitable ones, that 'confuses the question of who decides arbitrability with the separate question of who prevails on arbitrability.'" *Id.* at 896 (quoting *Henry Schein*, 586 U.S. at 71).

In the present case, the development agreement incorporates the ICC Rules of Arbitration, which in turn provide that "if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement," then "the arbitration shall proceed, and the arbitral tribunal shall decide directly any question of jurisdiction."[10] Under the binding Sixth Circuit precedent cited above, and the persuasive out-of-circuit cases on point, this constitutes "clear and unmistakable evidence" that the parties agreed to arbitrate threshold issues of "arbitrability," regardless of the carveout provision in Section 21.b. *See, e.g.*, *Blanton*, 962 F.3d at 844–45. That

[10] *See* ICC, *2026 Arbitration Rules*, https://iccwbo.org/dispute-resolution/dispute-resolution-services/arbitration/rules-procedure/2026-arbitration-rules/#block-accordion-8 (last visited August 14, 2026).

carveout provision "goes to the *scope of the agreement*," and "not the *scope of the arbitrator's authority* to decide questions of 'arbitrability.'" *Id.* at 848 (emphasis in original). Papa John's thus "'confuses the question of who decides arbitrability with the separate question of who prevails on arbitrability.'" *West Care*, 822 F. App'x at 896 (quoting *Henry Schein*, 586 U.S. at 71). As to the former question, the Court finds that the parties have clearly and unmistakably delegated questions of arbitrability to the arbitrator.

When parties have agreed to arbitrate the question of arbitrability, as they have here, "a court may not disregard their agreement—even if a particular argument for arbitration seems to be 'wholly groundless.'" *Blanton*, 962 F.3d at 844 (quoting *Henry Schein*, 586 U.S. at 68). As such, the Court finds that the threshold question of arbitrability—i.e., whether the parties agreed to arbitrate Papa John's claims—must be decided by the arbitrator, not the Court. The Court will therefore grant Xu's request to stay this matter pending that arbitration.[11]

## III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

1. The Motion to Dismiss for Lack of Personal Jurisdiction, or, in the alternative, Motion to Enforce Arbitration Provision and Dismiss filed by Defendant Jiandong (Peter) Xu, [**R. 32**], is **GRANTED IN PART** and **DENIED IN PART**.
    a. The motion is **DENIED** to the extent it seeks dismissal for lack of personal jurisdiction.
    b. The motion is **GRANTED** to the extent it asks this Court to stay this matter pending arbitration.

[11] Xu does not ask this Court to compel arbitration, nor does it appear that this Court could do so. *See Peerless*, 2022 WL 1156963, at *5.

2. This matter is **STAYED** pending arbitration of the arbitrability issues outlined herein. Within seven (7) days of the resolution of those arbitrability issues, or by November 20, 2026, whichever comes first, the parties **SHALL** file a Joint Status Report advising of the status of the arbitration proceedings.

This the 17th day of August, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY